UNITED STATES of America, Appellee,

v.

Deinner ROSA, Defendant–Appellant.

No. 1486, Docket 96–1530.

United States Court of Appeals,
Second Circuit.

Submitted/Argued May 7, 1997.

Decided Aug. 19, 1997.

Clover M. Barrett, Brooklyn, NY, for Defendant–Appellant.

Dolan L. Garrett, Assistant United States Attorney, Brooklyn, NY, Zachary W. Carter, United States Attorney, Peter A. Norling, Assistant United States Attorney, of counsel, for Appellee.

Before FEINBERG, OAKES and LEVAL, Circuit Judges.

OAKES, Senior Circuit Judge:

The central issue presented in this appeal concerns the validity of an appeal waiver provision in plea agreements used by the United States Attorney's Office for the Eastern District of New York. Appellant Deinner Rosa appeals the sentence entered July 31, 1996, by I. Leo Glasser, *Judge*, sentencing him to 27 months' imprisonment, three years' supervised release, and a $50 special assessment. Judge Glasser increased Rosa's base offense level by three levels, reasoning that the sale and possession of guns by Rosa's coconspirator constituted relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B), and thus warranted the three-level increase in accordance with § 2K2.1(b)(1)(C). Rosa asserts that this

increase was improper. The Government, however, responds that, under the terms of his plea agreement, Rosa has explicitly waived the right to appeal any sentence within a Guidelines range as determined by the sentencing court.

Despite our serious reservations with respect to the waiver provision, we deny Rosa's appeal.

## I

### Facts

On May 15, 1995, one Daniel Espinal brought a confidential informant to 2911 Fulton Street in Brooklyn, New York, having previously told the informant that Espinal could provide him with firearms. Espinal and the informant entered the premises, where Espinal introduced the informant to a man who sold him a .380 semi-automatic pistol, which he had taken from a drawer. While negotiating to buy the pistol, the informant saw an additional four firearms—one assault rifle, two semi-automatic pistols and a revolver—inside the drawer. After the sale, Espinal took the informant to an apartment on the second floor of 2891 Fulton Street and there informed him that he should come to that apartment if he were interested in buying cocaine.

On May 25, 1995, the informant met Espinal in front of 2911 Fulton Street. The two entered the premises, where the same man who had sold the weapon on May 15 sold the informant a second .380 caliber semi-automatic pistol. The informant again saw several small-caliber firearms in a drawer.

On June 1, 1995, an undercover police officer was introduced to Espinal by the informant in front of 2911 Fulton Street. The undercover officer informed Espinal that he was interested in buying three guns, and Espinal told him that the guns would be delivered soon. Shortly thereafter, Appellant Deinner Rosa arrived, and Espinal informed the undercover that Rosa was "the man with the guns."

Rosa asked Espinal who the undercover officer and the informant were and whether they could be trusted. Espinal informed

Rosa that he had done business with them and that they could be trusted. The four men then went inside 2891 Fulton Street. While in the hallway, Rosa informed the undercover officer that he had only one gun but that, in the future, he could supply the undercover with any firearms he wanted, including machine guns and silencers. Rosa then entered the second-floor apartment that Espinal had earlier identified to the informant as the place in which to purchase cocaine. Shortly thereafter, Rosa exited the apartment and handed the undercover a box containing a .380 caliber semi-automatic pistol loaded with five rounds of ammunition. The undercover officer thereafter paid Espinal $700.

On June 5, 1995, Espinal agreed to sell the undercover officer four guns. Later that day, the two met in front of 2911 Fulton Street. Espinal told the undercover that the supplier had left because the undercover was late but that he could still supply a gun if the undercover were interested. Espinal and the officer walked to a nearby apartment building where Espinal introduced the undercover officer to another man, who subsequently produced a .38 caliber revolver.

Based on the June 1 gun sale, the undercover officer obtained a search warrant for the second-floor apartment at 2891 Fulton Street. On June 16, 1995, law enforcement officers executed the warrant. As a result of that search, Appellant Rosa was arrested and a 9mm semi-automatic pistol was recovered.

On July 14, 1995, Rosa and Espinal were indicted for engaging in the business of dealing in firearms in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D). In the same indictment, Rosa and three others were also charged with conspiring to possess with the intent to distribute crack cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii). The gun count carried a maximum penalty of five years' imprisonment and no minimum, while the narcotics count carried a minimum penalty of ten years and a maximum of life imprisonment.

On October 17, 1995, Rosa pled guilty to engaging in the business of dealing in illegal firearms pursuant to a written plea agreement. The plea agreement estimated the likely adjusted offense level to be 14, with a resulting sentencing range of 15 to 21 months' imprisonment. This estimate calculated a base offense level of 12 pursuant to § 2K2.1(a)(7), with a three-level increase for a total of eleven guns pursuant to § 2K2.1(b)(1)(C), and an increase of two levels, pursuant to § 2K2.1(b)(4), because a serial number on one gun was obliterated, resulting in an adjusted base offense of 17. The plea also anticipated a three-level reduction for acceptance of responsibility pursuant to § 3E1.1(a) and (b), for a final estimated adjusted offense level of 14. The plea agreement also included the following provision:

> The defendant agrees not to file an appeal in the event that the Court imposes a sentence within or below the applicable Sentencing Guidelines range as determined by the Court.

The Probation Department's Pre–Sentence Report ("PSR") recommended calculations which resulted in an offense level significantly different from that anticipated in the plea agreement. The PSR stated that one of the weapons for which Rosa was responsible was a firearm described in 18 U.S.C. § 921(a)(30), which led to a base offense level of 18 rather than the previously estimated level of 12. Three levels were added under § 2K2.1(b)(1)(C) because the offense involved at least eight firearms: the three firearms sold on May 1, May 25, and June 5; the one sold by Rosa on June 1; and the four observed during the May 15 sale. Two levels were added for the obliterated serial number; another two levels were added pursuant to § 3C1.2 because Rosa resisted arrest and pointed a firearm at the arresting agents.[1] This took the resulting recommended adjusted offense level up to 25. Finally, the PSR recommended a three-level reduction for acceptance of responsibility, which resulted in an adjusted offense level of 22—much higher than the offense level 14 which Rosa had expected.

---

1. The PSR referred to this enhancement as one for Obstruction of Justice, but § 3C1.2 is actually entitled "Reckless Endangerment During Flight." The enhancement provision relating to Obstruction of Justice may be found at § 3C1.1.

The court accepted the PSR's recommended base offense level of 18 because of the type of weapons involved, as well as the three-level § 2K2.1(b)(1)(C) increase. Rosa objected to the increase, asserting that the sale of firearms by Espinal using other suppliers was not foreseeable to Rosa. Judge Glasser, however, determined that Rosa was responsible for the acts of his co-defendants under § 1B1.3 and related Application Note 2 (Relevant Conduct), which provides that a defendant is accountable for the conduct of others that was both in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity. The court therefore sentenced Rosa in accordance with the Guidelines provision for a crime involving sale of more than eight firearms. The court did not apply the recommended two-level increase for the obliterated serial number or the two-level increase for reckless endangerment. The resulting offense level was thus 21. The court then gave Rosa the three-level reduction for acceptance of responsibility. The final offense level of 18 carried a penalty with the range of 27 to 33 months' imprisonment; Judge Glasser sentenced Rosa to the lowest possible sentence within that range, 27 months' incarceration.

## II

### Discussion

Rosa challenges the district court's application of the § 2K2.1(b)(1)(C) three-level increase. He contends that he should be responsible for not more than a one-level increase because he only participated in a single gun sale involving three guns. The Government, however, contends that we ought not to reach the merits of this appeal because Rosa waived his right to appeal his sentence under the terms of his plea bargain agreement. The plea agreement provided that Rosa waived his right to appeal if the sentence he received were within or below the applicable Guidelines range as determined by the sentencing court. The district court determined that the applicable Guidelines range was 27 to 33 months' imprisonment, and sentenced Rosa to 27 months. According to the plain terms of the plea agreement, therefore, Rosa has waived his right to appeal. The question for us is whether this waiver provision is one to which Rosa may be held.

■ In general, a defendant's knowing and voluntary waiver of his right to appeal a sentence within an agreed guideline range is enforceable. *United States v. Maher*, 108 F.3d 1513, 1531 (2d Cir.1997); *United States v. Jacobson*, 15 F.3d 19, 22–23 (2d Cir.1994); *United States v. Salcido–Contreras*, 990 F.2d 51, 53 (2d Cir.1993) (per curiam); *United States v. Rivera*, 971 F.2d 876, 896 (2d Cir. 1992). We recognize that plea agreements can have extremely valuable benefits to both sides—most notably, the defendant gains reasonable certainty as to the extent of his liability and punishment, and the Government achieves a conviction without the expense and effort of proving the charges at trial beyond a reasonable doubt. We also understand that the waiver provision is a very important part of the agreement—the Government's motivating purpose, decreased effort and expense of protracted litigation, is not well-met if the defendant is permitted to appeal that to which he has agreed. It is not our intention to hamper or restrict parties' ability to enter pleas, so long as the agreement does not result in a serious detriment to important public or private interests, and we thus ordinarily enforce these waiver provisions. We have stated that "[i]n no circumstance . . . may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement. Such a remedy would render the plea bargaining process and the resulting agreement meaningless." *Salcido–Contreras*, 990 F.2d at 53. This rule has been held to bar even those appeals which claim that the sentencing court illegally sentenced the defendant under the Guidelines and relevant statutes, so long as the court nevertheless imposed a sentence within the range outlined in the agreement. *United States v. Yemitan*, 70 F.3d 746, 748 (2d Cir.1995) ("If this waiver does not preclude a challenge to the sentence as unlawful, then the covenant not to appeal becomes meaningless and would cease

to have value as a bargaining chip in the hands of defendants."); *cf. United States v. Haggard*, 41 F.3d 1320, 1325 (9th Cir.1994) (right to appeal not waived where ultimate sentence does not conform to the stipulated range).

■■■ It must be noted, however, that any plea agreement which contains a waiver of an important right, such as the right to appeal, poses theoretical concerns. As we have stated, "[p]lea agreements are subject to the public policy constraints that bear upon the enforcement of other kinds of contracts." *Yemitan*, 70 F.3d at 748 (citation omitted). Specifically, we have held that the right to appeal serves important interests of both the criminal defendant and of the public at large, so that waivers of that right must be closely scrutinized and applied narrowly. *United States v. Ready*, 82 F.3d 551, 556 (2d Cir. 1996). We have not held criminal defendants to their waivers of this right in every circumstance. *See id.* at 555 ("[N]o circuit has held that these contractual waivers are enforceable on a basis that is unlimited and unexamined."); *Yemitan*, 70 F.3d at 748 ("We do not hold that the waiver of appellate rights forecloses appeal in every circumstance. '[A] defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court.'") (quoting *United States v. Marin*, 961 F.2d 493, 496 (4th Cir.1992)). A waiver must be made knowingly and voluntarily. *Ready*, 82 F.3d at 556–57. A waiver will not bind a defendant if the sentence is imposed with ethnic bias. *Jacobson*, 15 F.3d at 22–23. A defendant may appeal if the Government breaches the terms of the plea agreement. *United States v. Gonzalez*, 16 F.3d 985, 990 (9th Cir.1993) ("By opposing the acceptance of responsibility adjustment, the government by its breach of the agreement released [defendant] from his promise ... not to appeal."). We have held that "a waiver of the right not to be sentenced on the basis of a constitutionally impermissible factor may be invalid...." *Jacobson*, 15 F.3d at 23 (citation omitted) (discussing arguably unconstitutional consideration of naturalized status). We have mentioned: 1) the "arbitrary prac-

tice of sentencing without proferred (sic) reasons" which we thought could in some cases "amount to an abdication of judicial responsibility subject to mandamus," *Yemitan*, 70 F.3d at 748; 2)the defendant's right to appeal on the grounds of ineffective assistance of counsel, *Ready*, 82 F.3d at 555 (citing *United States v. Henderson*, 72 F.3d 463 (5th Cir.1995)); and 3) the arguably unconstitutional consideration of naturalized status, *Jacobson*, 15 F.3d at 23 (brought as violation of due process). *But cf. United States v. Braimah*, 3 F.3d 609, 611 (2d Cir.1993) ("defendants can waive elemental constitutional and statutory rights"); *United States v. Mortimer*, 52 F.3d .429, 435 (2d Cir.) (on appeal of conviction, holding that defendant's Double Jeopardy argument was waived by plea agreement), *cert. denied*, —— U.S. ——, 116 S.Ct. 208, 133 L.Ed.2d 141 (1995); *United States v. Waters*, 23 F.3d 29, 36 (2d Cir.1994) (same, regarding Ex Post Facto argument). To meet these concerns, we have held that such agreements are to be interpreted narrowly, and while we generally apply principles of contract law when evaluating the propriety of a plea, see *Ready*, 82 F.3d at 556; *Yemitan*, 70 F.3d at 747, we nevertheless recognize that the analogy to contract law is not a perfect one and cannot be strictly applied. *See, e.g., Ready*, 82 F.3d at 558 (citing, inter alia, *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir.1992) ("Plea agreements ... are unique contracts 'in which special due process concerns for fairness and the adequacy of procedural safeguards obtain.'")).

In addition to our over-arching concerns regarding appeal waiver provisions, we perceive more specific and potentially more problematic issues relating to the particular waiver provision here before us, which differs in a substantial respect from the provisions previously approved by our court in cases such as *Salcido–Contreras*. An ordinary appeal waiver provision waives the defendant's right to appeal a sentence falling within a range explicitly stipulated within the agreement itself. *See, e.g., Maher*, 108 F.3d at 1531; *Salcido–Contreras*, 990 F.2d at 51; *Rivera*, 971 F.2d at 896.[2] While the sentenc-

---

**2.** For example, the plea agreement in *Salcido–*      *Contreras* provided:

ing judge is of course not bound by the estimated range,[3] the defendant retains the right of appeal if the ultimate sentence exceeds the prediction. Rosa's agreement, in contrast, provides that "[t]he defendant agrees not to file an appeal in the event that the Court imposes a sentence within or below the applicable Sentencing Guidelines range *as determined by the Court.*" Plea Agreement at 3 (October 17, 1995) (emphasis added). The estimated range, therefore, provides no protection to the defendant—he retains no right of appeal unless the court upwardly departs from the range which it determines to be proper, a range which could bear little to no resemblance to the predicted range. No provision for appeal exists simply because the ultimate sentence proves to be beyond, or even considerably beyond, the anticipated range. Here, therefore, even though Rosa was led to believe that he was likely to be sentenced within the range of 15 to 21 months, under the terms of the waiver he retains no avenue of appeal despite the fact that he was actually sentenced to 27 months. In fact, the waiver provides that he would have been able to appeal only if the sentencing court, having determined upon a range of 27–33 months' imprisonment, were to have departed upwardly from that range and sentenced him to 34 or more months.

We believe that this unorthodox agreement presents grave dangers and implicates both constitutional questions and ordinary principles of fairness and justice. As we have already stated, we do not handle waivers of important rights casually, *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Yemitan,* 70 F.3d at 749 (Newman, *J.,* dissenting); *Felder v. United States,* 429 F.2d 534, 535 (2d Cir.1970), and therefore must take a close look at this waiv-

er provision and assess those areas in which it is more problematic than those approved in cases such as *Salcido–Contreras,* before ruling upon its enforceability.

First, the waiver provision used by the Government in this case leaves a criminal defendant entirely to the mercy of the sentencing court. Although sentencing courts are generally competent and fair, they are not immune from mistake or even occasionally from abuse of discretion. If a case goes to trial, of course, any such mistakes or abuses are correctable upon appeal; under a standard plea agreement, such errors are similarly correctable upon appeal if they result in a final sentence which exceeds the predicted range. Under the ordinary plea, therefore, the defendant assumes the risk of error or abuse without appellate review only to the extent of the maximum sentence outlined in the plea agreement—beyond that outer boundary, he may challenge any perceived errors on appeal. The standard agreement allows him, in advance, to evaluate the predicted range and assess in an informed manner whether he is willing to accept the risk that he will receive a sentence in the upper part of the range and be unable to appeal. There is a direct connection between the predicted range and the right to appeal.

Under the unusual agreement drafted by the United States Attorney for the Eastern District, however, the defendant assumes a virtually unbounded risk of error or abuse by the sentencing court. He is not able to rely upon the predicted range for any guaranteed point at which his right to appeal will be retained. This result is of particular concern when viewed in the light of § 1B1.3(a)(1)(B), the "relevant conduct" provision of the Sen-

[I]t is specifically understood that no party will appeal a sentence by the Court that falls within the sentencing range calculated above, even should the Court reach that range by a Guidelines analysis different from that set forth above.

*Salcido-Contreras,* 990 F.2d at 51. The agreement in *Rivera* provided:

The parties further agree that should the Court sentence [the defendant] on the lesser offense included in Count One [the narcotics conspiracy], as specified above, within the range set forth in the third paragraph of this Agreement, neither the Government nor the defendant will

file a notice of appeal in the district court for review of the sentence imposed on that offense. *Rivera,* 971 F.2d at 896. The *Maher* defendant "agreed not to appeal 'any sentence within or below the stipulated Guidelines range[s].'" *Maher,* 108 F.3d at 1531.

**3.** *An exception may be found in those plea agreements which are made pursuant to Fed. R.Crim.P. 11(e)(1)(C), which collapse should the sentencing court determine upon a sentence exceeding the predicted range.*

tencing Guidelines, which allows a sentencing court to consider uncharged conduct, including conduct that may be brought to the court's attention by virtue of the PSR or other means *after* the defendant has agreed to the plea, and to correspondingly sentence the defendant to significantly greater penalties. Not only might a criminal defendant be subject to these heightened penalties by virtue of his own conduct, he might, as was Rosa, be held liable for the conduct of others.[4] The lack of connection between the predicted range of the agreement and the retention of the right of appeal becomes critical when viewed in conjunction with this provision of the Guidelines. A sentencing court could, in theory, sentence to a life term a defendant who had signed a plea which anticipated only a few months of imprisonment, and that defendant, under the terms of this agreement, would have no right to appeal even if the sentence were made erroneously.[5]

The Government asserts that it began two years ago to use this form of plea bargaining agreement only in those cases where the defendant has received a particularly favorable deal, favorable in terms exceeding those provided for in an ordinary plea bargain. The Government argues that, in exchange for these attractive offers, it ought to be assured that it will not have to engage in protracted appellate litigation. It thus asserts that this

interpretation is the correct and fair one for us to apply. As already noted, however, the relevant conduct provision of the Guidelines can make illusory what appears in advance to be a good deal.[6] We therefore are not swayed by this economic efficiency argument.

Our foremost concern with this plea agreement is that it may subject a defendant to a sentence vastly greater than he, or possibly even the Government, could have anticipated, and yet he would have no right to appeal. Yet this is not the only problem presented by this agreement. A second disturbing characteristic of this waiver provision relates to the well-established principle that all plea bargains must be made knowingly and voluntarily. It has been recognized that even under a standard plea agreement a court must carefully scrutinize the plea proceeding and search for a clear demonstration of the extent of the defendant's knowledge and the voluntary nature of the plea. *Ready*, 82 F.3d at 556–57. We believe that the particular plea agreement before us implicates the "knowing and voluntary" inquiry to an even greater extent than does the standard plea. This waiver provision is complex, and may be ambiguous and confusing to a defendant. To have an understanding of precisely what he is waiving, the defendant must grasp the distinction between 1) the court's upward departure from a sentence range which the court has already determined to be the prop-

4. For example, it may happen in virtually any nickel bag drug case in which the defendant has made a small sale or delivery on behalf of a professional dealer that, at the time of sentence, more becomes known about the activities of the defendant's professional employer. In such cases, the one-bag defendant may find himself liable for the multi-kilo quantities handled by his boss.

5. The Government asserted at oral argument that some limits upon the ·applicability of the waiver provision must inherently survive. For example, a defendant would certainly retain the right to appeal a sentence of death as punishment for pleading guilty to a crime that did not carry the death penalty. As this seems an unlikely occurrence, we are more concerned with those occasions upon which the defendant wants to appeal a sentence of 11 years' imprisonment for a crime that statutorily carries a maximum of 10 years. The Government asserted that the sentencing range was limited by the maximum sentence provided for by the offense statute, and posited

that this sentence would be appealable despite the waiver. Yet nothing in the language of the waiver indicates that this necessarily follows.

6. Here, for example, the Government asserts that it utilized this particular plea agreement rather than the more orthodox one because it had refrained from charging Rosa on charges relating to sale of cocaine. The sentencing court could, however, have utilized the relevant conduct provision to penalize Rosa further for the cocaine-related conduct—conduct which, under the Guidelines, need only be proven by a preponderance of the evidence rather than the more stringent beyond a reasonable doubt standard which would be required had the Government been forced to prove its case at trial—and Rosa could be left with a result just as unfavorable (or even far worse) than he would have achieved had he been charged with the conduct. And he would be unable to appeal the sentence. The Government's so-called "sweet deal" is thus considerably soured by § 1B1.3(a)(1)(B).

er application of the Guidelines, a result which *is* appealable; and 2) the court's application of the Guidelines to establish a sentence above the predicted range, a result which *is not* appealable. The Guidelines are quite complex, and the distinction between upward departures and relevant conduct enhancements which remove one from a predicted range are difficult even for attorneys and judges to grasp. A defendant could easily misunderstand the plea to mean that he would retain the right of appeal if the court were to sentence him more harshly than the predicted sentence range.

Recognizing that other issues may be implicated by this particular waiver provision, then, we here primarily focus upon two concerns which arise above and beyond those presented by ordinary agreements. First, the waiver provision could result in an unfair or potentially unconstitutional result even if the defendant did understand its terms, because he might not know of or perceive the consequences of the harsh relevant conduct provision of the Guidelines. Second, the provision is likely to result in a non-voluntary or unknowing waiver, because a defendant is likely not to grasp the essential nature of the waiver.

▆▆▆▆ Having expressed these concerns, we must nevertheless hold that this waiver provision, while questionable, is not facially invalid. Its terms will not automatically achieve an unfair result, and it does not inherently violate the Constitution. Rather, the two concerns upon which we have focused involve inquiry into the actual facts of the case. A request for appeal arising from such a plea bargain will not be summarily denied, as are many such requests arising from standard plea agreements. Instead, such a request will cause us to examine carefully the facts of the case and to look at the manner in which the agreement and the sentence were entered into and applied to determine whether it merits our review.[7] In particular, above and beyond the scrutiny applied to all pleas as referenced in *Ready,*

we will focus upon 1) the extent to which the defendant actually understood both the scope of the waiver provision and the factors at work which encompass his risk of a sentence exceeding the predicted range, and 2) the extent of actual discrepancy between the predicted range and the ultimate sentence. Our oversight role permits us to accept appeal of a case where the sentence or the agreement calls for it, despite our preference for deferring to the parties' freedom to contract. We will certainly often be willing to set aside the waiver and accept appeal when constitutional concerns are implicated, whether those concerns be related to a particular constitutional provision such as the ex post facto clause, or whether it simply appears that the ultimate sentence is so far beyond the anticipated range that to deny the right of appeal would raise serious questions of fundamental fairness. We may also be willing to accept such an appeal for lesser improprieties, including abuse of judicial discretion. We are not prepared today to outline an exhaustive list of the circumstances under which we would or would not accept such an appeal.

▆▆▆ Here, after carefully scrutinizing the facts of Rosa's case, we see nothing unconstitutional and nothing so unfair or erroneous as to warrant our refusal to uphold the agreement. First, Rosa has asserted no constitutional violation, and we do not perceive any such infraction. Second, as to fairness, we must mention that Rosa undoubtedly secured considerable benefits from his agreement. He was permitted to plead guilty to an offense that carried no mandatory minimum sentence of imprisonment, thus escaping the ten-year minimum sentence connected with the other charge in the indictment. He also obtained the Government's assent to a three-level reduction for acceptance of responsibility, and received that reduction at sentencing. While receipt of the expected benefits of a plea is, of course, not in and of itself a reason to hold a defendant to a plea agreement which is oth-

---

7. The necessity of this careful scrutiny, of course, negates much of the benefit that the Government receives from the waiver provision, i.e., deterrence of appeals and savings in the time and expense of appeal. We therefore suggest that the

United States Attorney's Office for the Eastern District consider our comments and evaluate carefully the propriety and ambiguity of this waiver provision when drafting future plea agreements.

erwise invalid, we mention it as it goes to the overall fairness, and thereby the validity, of that agreement. Furthermore, although it is possible that Rosa did not foresee what actually occurred at sentencing, we can see no fundamental unfairness in that result. There may be a situation where it appears to us that it would be fundamentally unfair to hold a defendant to the waiver of appeal because the combination of the length of sentence and the conduct for which the defendant is held accountable are vastly different from what was anticipated by the plea agreement. This is not such a case. Judge Glasser's application of the Guidelines, most notably the relevant conduct provision, did not result in a significantly higher sentence than the predicted range. The 27–month sentence exceeded the top end of the predicted range by only six months. Furthermore, far from applying the Guidelines in an abusive manner, Judge Glasser clearly bent over backwards to bring Rosa's sentence down to where it was as close as possible to the predicted range given the judge's determination of the appropriate Guidelines.[8]

■■■ As to error, we note that, even were we to accept appeal in this case, we would find no error in the sentencing court's application of § 2K2.1(b)(1)(C) and the corresponding three-level increase. Section 1B1.3(a)(1)(B) and our holding in *United States v. Studley,* 47 F.3d 569, 573 (2d Cir. 1995), make clear that the district court may hold a defendant accountable for the actions of another if 1) the acts were within the

scope of the defendant's agreement to participate in the criminal activity, and 2) the acts were foreseeable to the defendant. Here, the district court made such findings, and we agree that they were not erroneous.[9] It is thus difficult to find a point of fundamental unfairness or error in the resulting sentence despite the fact that Rosa may not have expected to be held accountable for his cohort's actions.[10] Also going to the issue of error, although we have questioned whether the ambiguity and complexity of the waiver provision would support a holding that a defendant's plea was not entered "knowingly and voluntarily," we do not reach this issue here because there is no evidence or argument that Rosa's plea was involuntary or that he did not understand the ramifications of the waiver provision.[11]

In sum, despite our serious concerns with the plea bargain waiver provision drafted by the Eastern District U.S. Attorney's Office, we see no constitutional issue, fundamental unfairness, or error related to this case. Rosa appears to have received the benefit of his bargain and certainly has sustained no harm serious enough to warrant our acceptance of this appeal, viewed from both ex ante and ex post perspectives. We therefore uphold the plea bargain waiver provision as applied in this case, and deny Rosa's appeal.

---

8. Although the sentencing court clearly felt that the conduct of Rosa's co-conspirator constituted conduct serious enough to warrant inclusion in the sentence, it did make other accommodations which brought the sentence back down to something near the predicted range rather than applying the level 22 sentence recommended by the PSR. The court did not apply the recommended 2–level increase for the obliterated serial number or the 2–level increase for reckless endangerment. It further accepted the 3–level reduction for acceptance of responsibility as suggested by all the parties. Having determined upon the 27–33 month range, the court sentenced Rosa to the lowest possible sentence within that range.

9. While Rosa disclaimed involvement in the sales taking place at 2911 Fulton Street, he did admit at sentencing that he knew both that Espinal was dealing in guns and that Espinal had dealt previously with the undercover officer and the infor-

mant. Espinal's activity therefore could be deemed to be foreseeable to Rosa. Their activities also could be found to have been taken in accordance with the agreement between Espinal and Rosa to deal in firearms, in part because Espinal referred to Rosa as "the man with the guns," indicating that the two had an ongoing relationship and agreement to refer gun sales to each other.

10. We mention this issue not as a decision on the merits, but only to the extent that it aids our inquiry into the extent of the harm Rosa has sustained.

11. The knowing or voluntary nature of Rosa's plea was not addressed by Rosa's counsel in his brief (nor, for that matter, was any other aspect of the waiver provision). The issue of knowing or voluntary waiver is thus deemed either nonexistent or waived.