**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert E. CSEPLO, Defendant–Appellant.**

**No. 94–3571.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 3, 1994.

Decided Dec. 13, 1994.

John M. Siegel, Asst. U.S. Atty. (argued and briefed), Office of U.S. Atty., Cleveland, OH, for plaintiff-appellee.

Phillip J. Campanella (argued and briefed), Calfee, Halter & Griswold, Cleveland, OH, for defendant-appellant.

Before: KENNEDY, MARTIN, and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Convicted both of willfully underreporting income on his wholly-owned corporation's federal income tax return (a violation of 26 U.S.C. § 7206(1)) and of willfully attempting to evade individual income taxes by preparing and signing a return that failed to report the receipt of sums skimmed from the corporation (a violation of 26 U.S.C. § 7201), the defendant was sentenced to imprisonment for a term of four months. He now appeals his sentence, contending, among other things, that in calculating the "tax loss" under the sentencing guidelines the district court ought to have reduced the unreported individual income by the amount of additional tax that the corporation would presumably

have paid if its return had been accurate. We find no error in the district court's methodology, and we shall therefore affirm the sentence.

## I.

The defendant, Robert E. Cseplo, is the president and sole shareholder of Kimco Products, Inc., a manufacturer of stainless steel items. During 1987, and for several years thereafter, Kimco sold scrap metal to a purchaser that paid for the scrap with checks made out to cash. Mr. Cseplo converted most of these checks to his own use, skimming off more than a quarter of a million dollars of corporate revenues.

The corporate income reported on tax returns signed by Mr. Cseplo for the fiscal years ending August 31, 1988, through August 31, 1990, was understated by a total of $262,366. Mr. Cseplo converted $250,491 of this money to his personal benefit. On the individual income tax returns he filed for calendar years 1988 and 1989, Mr. Cseplo failed to report the receipt of diverted funds totaling $195,871.

In an information filed against him in February of 1994 by the United States Attorney for the Northern District of Ohio, Mr. Cseplo was charged with three counts of making and subscribing false corporate tax returns and two counts of attempting to evade individual income taxes. Pursuant to a plea bargain, he pleaded guilty to counts 3 and 4 of the information. Count 3 dealt with the corporate return for fiscal year 1989, where Mr. Cseplo understated Kimco's income by $113,335. Count 4 dealt with the individual return for calendar year 1989, where Mr. Cseplo understated his individual income by $114,779. Both returns were filed in 1990, one in May and the other in October.

In calculating the guideline sentencing range, the district court (Dowd, J.) used the edition of the guidelines manual that became effective on November 1, 1989. (This edition, which was in effect at the time Mr. Cseplo committed the crimes charged in counts 3 and 4 of the information, prescribed a lower sentencing range than did the version that was in effect during May of 1994, when the sentence was imposed.)

For purposes of determining the "base offense level" under 1989 U.S.S.G. §§ 2T1.1 and 2T4.1, the district court put the tax loss at $144,048. This sum was arrived at by applying a corporate tax rate of 34 percent to the unreported corporate income of $262,366 and applying an individual tax rate of 28 percent to the unreported individual income of $195,857.[1] The figures so produced—$89,204 for the corporate taxpayer and $54,844 for the individual taxpayer—were added together, making a total of $144,048. The central issue on appeal is whether it was proper to aggregate the corporate tax loss and the individual tax loss in this manner.

The tax table set forth at 1989 U.S.S.G. § 2T4.1 prescribes an offense level of 13 where the tax loss is more than $120,000 and not more than $200,000.[2] The district court therefore started with an offense level of 13 and allowed a two-level reduction for acceptance of responsibility. This produced a final offense level of 11.

Mr. Cseplo's record placed him in Criminal History Category I. Under the matrix set forth in the sentencing table of the guidelines, the indicated sentence of imprisonment for a person who is in Criminal History Category I and who has an offense level of 11 is 8–14 months. A "split sentence" is allowed in this range, however, with at least half of the minimum term taking the form of imprisonment and an additional segment taking the form of supervised release with a condition substituting community confinement or home detention. See 1989 U.S.S.G. § 5C1.1(d)(2). The district court utilized the split sentence

---

**1.** The highest marginal individual income tax rate for 1989, subject to minor qualifications ignored by the guidelines, was 28 percent. Mr. Cseplo's reported taxable income for 1989 exceeded three-quarters of a million dollars, which meant that all of his unreported income was taxable at the 28 percent rate.

**2.** The edition of the manual that became effective on November 1, 1993, prescribes an offense level of 15 for a tax loss of this magnitude. It is undisputed that this circumstance necessitated use of an earlier edition of the manual. The parties disagree as to which of two earlier editions should have been used.

option, sentencing Mr. Cseplo to imprisonment for a term of four months and supervised release for a term of two years, of which 120 days is to be served in home confinement.[3] Mr. Cseplo was also ordered to pay restitution and a $20,000 fine. He has not yet begun to serve his sentence, the district court having granted a motion to stay the sentence pending appeal.

## II.

### A

■ Citing *Miller v. Florida*, 482 U.S. 423, 430–31, 107 S.Ct. 2446, 2451–52, 96 L.Ed.2d 351 (1987), Mr. Cseplo argues that because the relevant conduct used in determining his sentence began prior to November 1, 1989, and because the preceding edition of the manual, which became effective on November 1, 1988, prescribed an offense level of only 12 for tax losses exceeding $120,000, it was fundamentally unfair, and a violation of the *ex post facto* clause of Article I, Section 9 of the Constitution, not to use the 1988 edition. We disagree.

The crimes of which Mr. Cseplo was convicted were not committed until May and October of 1990. Nothing in *Miller* suggests that it would be impermissible to calculate Mr. Cseplo's sentence under the guidelines in effect at that time. *Miller* merely held that guideline amendments adopted after the date of an offense for which the defendant has been convicted may not be used to increase the sentencing range—and nothing of that sort was done here.

It is true that some of the conduct deemed relevant by the district court antedated both the offenses for which Mr. Cseplo was convicted and the issuance of the edition of the manual under which he was sentenced. This does not entitle Mr. Cseplo to be sentenced under the earlier manual, however. See *United States v. Pierce*, 17 F.3d 146, 150 (6th Cir.1994), where we held that the *ex post facto* clause is not violated by taking into account relevant conduct that antedated the adoption of *any* sentencing guidelines.

It is clear, finally, that the version of the guidelines manual in effect at the time of sentencing did not instruct the district court to use an edition issued prior to commission of the crimes of which Mr. Cseplo was convicted. "The court shall use the Guidelines Manual in effect on the date the defendant is sentenced," U.S.S.G. § 1B1.11(a) provides, unless "the court determines that [this] would violate the *ex post facto* clause of the United States Constitution...." U.S.S.G. § 1B1.11(b)(1). If the court makes such a determination—as it did in the case at bar— "the court shall use the Guidelines Manual in effect as of the date that the offense of conviction was committed." *Id.* This is precisely what the district court did. The court also took cognizance of U.S.S.G. § 1B1.11(b)(2), which provides as follows:

"The Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual. However, if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes."

### B

■ Working our way through the language of the guidelines manual in effect on the date of the crimes of which Mr. Cseplo was convicted, it seems to us that the manual requires use of the base offense level—13— that was employed by the district court.

We start with Appendix A of the manual, which, as the introduction to the appendix explains, contains a statutory index specifying the guideline section or sections ordinarily applicable to the statute of conviction. The guideline section specified for a convic-

---

**3.** If the tax loss had been calculated in the manner urged by Mr. Cseplo, the offense level would have been lower than 11 and the court would have had the option of imposing a sentence of probation, with community confinement or home detention, in lieu of imprisonment. See 1989 U.S.S.G. § 5C1.1(c)(2). This option was foreclosed under the approach taken by the district court.

tion under 26 U.S.C. § 7201 (attempt to evade or defeat tax) is U.S.S.G. § 2T1.1. The guideline section specified for a conviction under 26 U.S.C. § 7206(1) (making false return) is U.S.S.G. § 2T1.3.

Part D of chapter 3 of the manual requires that the counts of conviction be grouped together, for sentencing purposes, "if the offense level is determined largely on the basis of the total amount of harm or loss...." U.S.S.G. § 3D1.2(d). Sections 2T1.1 and 2T1.3 do peg the offense level to the total amount of the loss, and § 3D1.2(d) explicitly provides that offenses covered by these particular sections are to be grouped together.

The offense level applicable to counts grouped together pursuant to § 3D1.2(d), the manual goes on to say, "is the offense level corresponding to the *aggregated quantity* [of the losses]...." U.S.S.G. § 3D1.3(b) (emphasis supplied). As applied to the facts of the instant case, this means that the $89,204 loss associated with count 3 of the information must be "aggregated" with the $54,844 loss associated with count 4. The aggregation of these two losses produces a total of $144,048.

Both the base offense level for tax evasion and the base offense level for making a false return are determined under the "Tax Table" set forth in § 2T4.1. See § 2T1.1(a) ("Base Offense Level: From § 2T4.1 (Tax Table) corresponding to the tax loss") and § 2T1.3(a) (same, "if the offense was committed in order to facilitate evasion of a tax").

Section 2T1.1(a) further provides that

"For purposes of this guideline, the 'tax loss' is the greater of: (A) the total amount of tax the taxpayer evaded or attempted to evade; and (B) the 'tax loss' defined in § 2T1.3."

The total amount of taxes that "the taxpayer" (Mr. Cseplo's corporation, in the case of count 3, and Mr. Cseplo, himself, in the case of count 4) evaded or attempted to evade was $144,048. This figure is not less than "the

'tax loss' defined in § 2T1.3,"[4] so $144,048 is the tax loss to which we must look in consulting the tax table at § 2T4.1. The tax table—specifically, U.S.S.G. § 2T4.1(H)—tells us that the offense level for a tax loss of more than $120,000 is 13.

Mr. Cseplo argues that in calculating the aggregate tax loss, the district court ought to have allowed the corporation a deduction for the entire amount that was skimmed from the corporation's gross income. The tax code permits the deduction of reasonable salary expenses (see 26 U.S.C. § 162(a)), and Mr. Cseplo suggests that recognition of a deduction that might have been available if honest returns had been filed would result in a more accurate assessment of the actual tax loss. Such an approach, he says, would have reduced the tax loss to under $60,000 and would have produced an offense level of 11, prior to the reduction for acceptance of responsibility.

Mr. Cseplo cites no published sentencing guideline decision in support of this approach, and nothing in the guideline language referred to above would seem to authorize such a deduction. In the edition of the guidelines manual that became effective on November 1, 1993, however, the substance of § 2T1.3 was folded into § 2T1.1 and the instructions on using 28 percent of unreported income for an individual taxpayer and 34 percent for a corporate taxpayer were qualified by adding the phrase "unless a more accurate determination of the tax loss can be made." 1993 U.S.S.G. § 2T1.1(c)(1)(A). Mr. Cseplo argues that the added phrase constitutes a "clarifying" change rather than a "substantive" one, and thus must be considered by the court pursuant to 1993 U.S.S.G. § 1B1.11(b)(2).

The district court expressed the view that the change was substantive, and the court therefore declined to consider it. We need not decide this issue. Even if the change were to be taken into consideration here, in

---

4. For purposes of § 2T1.3(a), that section provides, "the 'tax loss' is 28 percent of the amount by which the greater of gross income and taxable income was understated.... If the taxpayer is a corporation, use 34 percent in lieu of 28 percent." The district court correctly used 28 percent of the amount by which Mr. Cseplo's income was understated and 34 percent of the amount by which the corporation's income was understated. The "aggregated quantity," again, comes to $144,048.

our view, the qualifying phrase would not change the result.

All the new phrase does, as far as we can see, is tell the sentencing court not to calculate the tax loss on the basis of a 28 percent tax rate for individual taxpayers and a 34 percent tax rate for corporate taxpayers if a more accurate determination can be made. Twenty-eight percent is no longer the top marginal rate for individual taxpayers, for example, and depending on an individual's tax bracket and other factors, the tax loss occasioned by an underreporting of individual income might be either more than 28 percent or less. The new language suggests that the tax loss for both individuals and corporations ought to be computed as accurately as possible, but it does not suggest that any change has been made in the requirement that the offense level for counts that have been grouped together must correspond to the "aggregated quantity" of the separate tax losses. It is doubtful, moreover, that the tax code permits the deduction of diverted funds in any event. See note 6, below.

Mr. Cseplo goes on to argue, finally, that the tax loss determined by applying the 34 percent corporate rate to the corporation's unreported income ought to be deducted from the individual's unreported income before the individual taxpayer rate of 28 percent is applied to the latter category. Such an approach, Mr. Cseplo says, would fix the aggregated tax loss at less than $120,000, thereby reducing the base offense level to 12.

This is the method endorsed by the Court of Appeals for the Seventh Circuit in *United States v. Harvey*, 996 F.2d 919 (7th Cir.1993). With respect, we are not persuaded that *Harvey* ought to be followed here.

The decision in *Harvey* assumes that the defendant has committed "a single crime, [that] causes both corporate and personal income to be understated." *Id.* at 920. It further assumes that the funds diverted to the defendant's personal use constitute a "disguised dividend" the size of which would have been reduced by the amount of the

corporate tax if the "dividend" had been paid openly. *Id.* at 920.[5]

We are not prepared to indulge any of these assumptions in the case at bar. Mr. Cseplo pleaded guilty not to having committed a single crime, but to having committed two separate crimes. One offense, involving a corporate tax return, was committed in May of 1990, and the other, involving an individual tax return, was committed five months later. The guidelines are very specific about the necessity of aggregating the tax losses, and we see no justification for proceeding as if only one crime had been committed.

Neither do we see any justification for treating the skimmed money as a constructive "dividend" in an amount less than the amount Mr. Cseplo actually received. The label attached to wrongfully diverted money, our caselaw teaches, is unimportant. "It is not necessary to describe [such funds] as additional salary, illicit bonuses, or commissions, or anything more than wrongful diversions, since ... substance controls over form, and taxation is concerned with the actual command over the property taxed." *Davis v. United States*, 226 F.2d 331, 335 (6th Cir. 1955). Mr. Cseplo had "actual command" over a full quarter of a million dollars, unreduced by the income taxes that the corporation failed to pay, and we do not read the guidelines as saying that the tax loss resulting from Mr. Cseplo's failure to report his receipt of diverted funds should be calculated as if he had not received money that he did in fact receive.

Mr. Cseplo, as the government aptly points out in its brief,

"had the opportunity and ability to limit the criminal consequences to one or other of the returns. For example, he could have left the receipts unreported on the corporate return but added them as miscellaneous income on his personal return. Conversely, he could have added the receipts to the amounts reported on the corporate tax return, while still receiving the

---

5. The opinion recognizes the possibility that the "dividend" might not have been so reduced, but asserts that without such a reduction the portion corresponding in amount to the corporate tax

would constitute either a return of capital not taxable as income to the defendant or an "implicit wage or bonus" that would be deductible by the corporation. *Id.*

unreported personal benefit of the diverted funds. By choosing to falsify both returns, Cseplo made the deliberate decision to produce separate harm to the government with respect to both tax liabilities. The fact that Cseplo might have been able to claim a corporate salary deduction had he paid himself these moneys honestly and openly does not relieve him from the responsibility for creating the separate tax losses through the illegal course of conduct he chose in this case."[6]

The sentence is **AFFIRMED.**

---

**6.** The government adds, in a footnote, that

"Since a corporation may only deduct a 'reasonable' amount of salary, 26 C.F.R. § 1.162—7(a), it is not certain whether the receipts diverted by Cseplo would have been deductible if openly paid to him as salary. See *Kennedy v. Commissioner*, 671 F.2d 167, 173–77 (6th Cir. 1982). By concealing the payments, Cseplo avoided any IRS scrutiny on this issue." *Id.* n. 7.

This statement is correct as far as it goes, but it may also be true that the illicit diversion of funds is unreasonable *ipso facto*, and that such funds are no more deductible by the corporation than

bribes or kickbacks would be. See *Truesdell v. Commissioner*, 89 TC 1280, 1300, 1987 WL 258105 (1987) (where a party diverted to his own use income from his solely-owned corporation, "diverted amounts taxed to a shareholder as constructive dividends also remained fully taxable to the corporation to which attributable").

If Mr. Cseplo's unorthodox maneuvers resulted in a higher aggregate tax liability than would have existed otherwise, that is a risk Cseplo chose to run when he elected to break the law.