**UNITED STATES of America**

v.

**Lewis ALLEN and Luis Valerio, Defendants.**

**No. 07 CR 235 (SAS).**

United States District Court, S.D. New York.

Aug. 11, 2009.

---

Michael Q. English, Assistant United States Attorney, United States Attorney's Office, Southern District of New York, New York, NY, for the Government.

Michael H. Sporn, Esq., Law Office of Michael H. Sporn, New York, NY, for Defendant Allen.

Don D. Buchwald, Esq., Kelley Drye & Warren, New York, NY, for Defendant Valerio.

---

**AMENDED OPINION AND ORDER**

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

Defendants Lewis Allen and Luis Valerio pled guilty to the sale of a relatively small amount of crack cocaine. The Government contends that defendants were involved in a much broader conspiracy to distribute crack cocaine. A *Fatico* hearing was held on March 17 and 19, 2008. I now make findings of fact for the purpose of calculating the appropriate offense level based on the evidence presented at the hearing.

## II. BACKGROUND

### A. Facts

On March 6, 2007, in Bronx County, New York, defendants Lewis Allen and Luis Valerio conspired to distribute, possessed with intent to distribute, and distributed more than five grams of crack cocaine.[1] Valerio was indicted on March 27, 2007, and Allen was indicted on April 9, 2007.

On March 30, 2007, following Valerio's arrest, Magistrate Judge Gabriel Gorenstein held a detention hearing at which the Government represented that Valerio was "a street level pitcher for a large crack cocaine organization centered on Gerard Avenue between 167th and McLaughlin."[2] The Government further stated that the individuals at the top of the organization had been indicted in the Fall of 2006 and that the organization was "violent."[3] The

---

1. *See* 7/30/07 Transcript of Plea Allocution of Lewis Allen ("Allen Plea Tr.") at 16, 17; 8/1/07 Transcript of Plea Allocution of Luis Valerio ("Valerio Plea Tr.") at 15. The Indictments charged that the conspiracy spanned the period from January 2007 through March 26, 2007. *See* Indictment; Superseding Indictment.

2. *See* 3/30/07 Transcript of Valerio Criminal Cause for Detention Hearing Before the Honorable Gabriel W. Gorenstein ("Valerio Hearing") at 3.

3. *Id.*

Government further represented that there had been a murder in June of 2006 and there was "evidence that Mr. Valerio was involved in that murder, that he had a gun. He was one of the two shooters."[4]

The Government notified Valerio's counsel that it possessed an audio tape of Valerio speaking with a cooperating witness from November 16, 2006 (prior to the charged conspiracy). In response to Valerio's request for the tape, the Government stated that "the recording is not relevant to the trial charges...."[5]

The Government apparently offered defendants plea agreements that would have stipulated a sentencing range under the United States Sentencing Guidelines (the "Guidelines") but would have prohibited them from requesting a departure below that range.[6] Defendants did not accept the proposed plea agreements. However, the Government sent defendants letters (the "*Pimentel* Letters") advising them of the Government's calculation of their likely sentences under the Guidelines. The *Pimentel* Letters, which state that they "form[ ] no part of any plea agreement" between the Government and defendants,[7] purport to explain how the Guidelines would apply to defendants' sentences. First noting that "[t]he Government presently believes that the [Guidelines] apply

to the crime charged in the Indictment as follows," the letters state that because "[t]he offense conduct, *including all relevant conduct* under U.S.S.G. § 1B1.3, involved at least 150 grams but less than 500 grams of cocaine base,"[8] defendants' base offense level was equivalent to 32.[9] After calculating defendants' criminal histories and other adjustments, the letters observe that

> [t]he foregoing Guidelines calculation is based on the facts and information *presently known to the [Government]*. Nothing in this letter limits the right of [the Government] to change its position at any time as to the appropriate Guidelines calculation in this case, and to present to the sentencing Judge and/or Probation Department, either orally or in writing, any and all facts and arguments relevant to sentencing ... that are available to the [Government] at the time of sentencing.... [The Government] cannot and does not make any promise or representation as to what sentence the defendant[s] will receive.[10]

Pursuant to section 3E1.1 of the Guidelines, defendants would receive a three-level reduction for acceptance of responsibility and timely notice of intention to plead guilty. Allen's *Pimentel* Letter thus concludes that at Criminal History Catego-

---

**4.** Valerio Hearing at 4.

**5.** 7/30/07 Email from Assistant United States Attorney ("AUSA") Michael English to Don D. Buchwald, Attorney for Valerio, attached to 2/22/08 Letter from Buchwald to the Court ("Buchwald Ltr.")

**6.** *See* Buchwald Ltr.

**7.** 7/24/07 Letter from AUSA English to Defendant Lewis Allen ("Allen *Pimentel* Ltr.") at 1; 7/24/07 Letter from AUSA English to Defendant Luis Valerio ("Valerio *Pimentel* Ltr.") at 1.

**8.** The source of these quantities is unclear. Defendants allocuted only to the sale of slight-

ly over five grams of crack cocaine. *See* Valerio Plea Tr. at 15–16; Allen Plea Tr. at 16–17.

**9.** Allen *Pimentel* Ltr. at 2; Valerio *Pimentel* Ltr. at 2 (emphasis added). The letters actually concluded that under the November 2006 revision of the Guidelines, the base offense level was 34. The offense levels and sentence ranges in the text of the *Pimentel* Letters have been adjusted in accordance with the November 2007 Guidelines.

**10.** Allen *Pimentel* Ltr. at 3; Valerio *Pimentel* Ltr. at 4 (emphasis added).

ry I, offense level 29, Allen's Guidelines range was 87 to 108 months. Valerio's *Pimentel* Letter states that he would receive a two-level enhancement for possession of a firearm in the course of a narcotics conspiracy pursuant to section 2D1.1(b)(1) of the Guidelines. Based on Criminal History Category III, offense level 31, his Guidelines range was 135 to 168 months.[11]

On July 30, 2007, Allen pled guilty to Counts One and Two of the Superseding Indictment, which were, respectively, conspiracy to distribute and to possess with intent to distribute five or more grams of crack cocaine in violation of section 846 of title 21 of the United States Code and distributing or transferring five or more grams of crack cocaine in violation of sections 812 and 841 of title 21 of the United States Code.[12] On August 1, 2007, Valerio pled guilty to the same offenses.[13] At their pleas, each defendant admitted to the distribution of only slightly more than five grams of crack.[14] With respect to each count, defendants were told that they faced "a maximum sentence ... of forty years' imprisonment" and "a mandatory minimum sentence of five years' imprisonment...."[15] Defendants responded affirmatively when asked if they understood that "the guideline range found to apply in your case may turn out to be different from any range you've discussed with your attorney and it may be different from any range that your attorney has discussed with the government...."[16]

Following defendants' pleas, the Government alleged that defendants worked as street-level distributors for the crack cocaine distribution organization run by Angel Martinez (the "Martinez Organization" or the "Organization") from 2004 through 2006.[17] The Martinez Organization allegedly controlled "all crack distribution on Gerard Avenue between E. 167th Street and McClellan Avenue" for approximately fifteen years.[18] Valerio and Allen allegedly worked twelve-hour shifts for the Martinez Organization, selling bundles of crack cocaine on the streets. Each bundle allegedly contained fifteen bags of crack cocaine (approximately 1.65 grams per bundle) and cost $150. During one twelve-hour shift, defendants would typically sell five to seven bundles of crack cocaine.[19] The Martinez Organization allegedly distributed approximately thirty to forty-five bundles per week. The PSRs concluded that the Martinez Organization sold approximately 200 to 280 grams of crack cocaine per month and that this quantity was reasonably foreseeable to defendants. The PSRs estimated that over the period from defendants' first involvement in the Organization, in "late 2004 or early 2005," until the arrest of several members of the Organization in November 2006, defendants distributed between 4.8 and 6.72 kilograms of crack cocaine.[20] The PSRs also stated that both defendants possessed firearms in connection with the sale of crack

11. *See* Valerio PSR ¶ 5.

12. *See* Allen Plea Tr.

13. *See* Valerio Plea Tr.

14. *See id.* at 15–16; Allen Plea Tr. at 16–17.

15. Valerio Plea Tr. at 9, 11; Allen Plea Tr. at 9, 11.

16. Valerio Plea Tr. at 12; Allen Plea Tr. at 12–13.

17. *See* Allen PSR ¶ 10; Valerio PSR ¶ 11.

18. Allen PSR ¶ 10; Valerio PSR ¶ 11.

19. *See* Allen PSR ¶ 11; Valerio PSR ¶ 12.

20. Allen PSR ¶¶ 10, 14; Valerio PSR ¶¶ 12, 15.

cocaine.[21]

Based on the heightened quantity of crack cocaine, the PSRs concluded that the base offense level was 38.[22] Because defendants possessed firearms in connection with the offense, the offense level was raised to 40. After deducting three levels for timely acceptance of responsibility, the total offense level was 37. Based on defendants' Criminal History categories and offense level 37, the Guidelines range was 262 to 327 months for Valerio and 210 to 262 months for Allen.[23] The PSR recommended sentences of 180 months for both defendants, concluding that ten years would be appropriate for the distribution of crack cocaine and five years for the possession of a firearm.[24]

### B. Procedure

Because there were disputed issues of fact with respect to the drug quantity and possession of a firearm, this Court held a *Fatico* hearing on March 17 and 19, 2008 (the "*Fatico* Hearing").[25] Defendants also asked the Court to address whether the Government should be held to the statements it made in the *Pimentel* Letters regarding relevant conduct. Additionally, Valerio maintains that his guilty plea was based in part on the Government's statement that because the November 16, 2006 audio tape was not relevant to the charged conduct, he presumed that the conduct of

the Martinez Organization was also not relevant.[26] Defendants further argue that holding them responsible for the larger quantity of crack cocaine distributed by the Martinez Organization violates the Fifth and Sixth Amendments' guarantees of due process and trial by jury.[27] Defendants finally argue that if they are held responsible for the larger quantity, they are entitled to reductions in their offense levels as minimal participants under section 3B1.2(a) of the Guidelines.[28]

### III. APPLICABLE LAW

#### A. Relevant Conduct

Section 1B1.3(a)(1)(B) of the Guidelines provides that in calculating the base level of an offense, a court shall take into account "in the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[ ] that occurred during the commission of the offense of conviction...." [29] Thus, before a defendant may be held responsible for the actions of others, the Government "must prove by a preponderance of the evidence the existence of 'a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others.'" [30] Because "the scope of the criminal activity jointly

---

**21.** *See* Allen PSR ¶ 12; Valerio PSR ¶ 13.

**22.** The PSRs applied the November 2007 revision of the Guidelines.

**23.** *See* Allen PSR ¶ 16; Valerio PSR ¶ 18.

**24.** *See* Allen PSR at 16–17; Valerio PSR at 18–19.

**25.** *See United States v. Fatico,* 579 F.2d 707 (2d Cir.1978) (discussing the appropriate standard for pre-sentence evidentiary hearings). The *Fatico* Hearing was continued on March 19, 2008.

**26.** *See* Buchwald Ltr.

**27.** *See id.*

**28.** *See id.*

**29.** Guidelines § 1B1.3(a)(1)(B).

**30.** *United States v. Rizzo,* 349 F.3d 94, 100 (2d Cir.2003) (quoting Guidelines § 1B1.3(a)(1)(B)).

undertaken by the defendant ... is not necessarily the same as the scope of the entire conspiracy ... the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake...." [31] Thus, a sentencing court must first make a particularized finding as to the jointly agreed-upon scope of criminal activity. [32]

▆▆ The extent to which members of a criminal conspiracy agreed to undertake the illegal activity of the entire organization can be a difficult issue. It is clear that "a defendant's knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts." [33] Thus, " 'the scope of the overall operation' " is not determinative of the defendant's responsibility. [34]

▆▆ Once a court determines the scope of the criminal activity, the Guidelines make the defendant responsible for any reasonably foreseeable action performed in furtherance of that activity " 'regardless of whether the defendant acted to promote it or facilitate it.' " [35] The court must therefore determine which actions in furtherance of the illegal purpose were "reasonably foreseeable" to the defendant.

## B. *Pimentel* Letters

In *United States v. Pimentel,* two defendants who had been arrested after trafficking one kilogram of cocaine were convicted of a narcotics conspiracy. [36] According to

section 2D1.4 of the November 1989 revision of the Guidelines (in effect at the time), the offense level of a defendant convicted of a narcotics conspiracy was the level that would apply if the object of the conspiracy had been completed. Defendants contended that they should only be held responsible for the single kilogram that they delivered to the undercover officer, but the district court determined that the defendants had negotiated to supply undercover officers with two kilograms of cocaine. The Court of Appeals for the Second Circuit determined that there was sufficient evidence to support the district court's factual finding and that there was no violation of due process. [37]

The Circuit then stated:

[W]e are quite troubled by the escalating number of appeals from convictions based on guilty pleas in which the appellant claims that he was unfairly surprised by the severity of the sentence imposed under the Guidelines. In particular, we note the distressingly large number of appeals involving defendants indicted for drug offenses who, at the time of tendering their pleas, were apparently unaware of the quantity of drugs that could be included in calculating their base offense levels. While these defendants may have entered their pleas "knowingly and voluntarily" in the constitutional sense, we are, given our own struggles with the Guidelines, not unsympathetic to their claims that they did not fully appreciate the conse-

31. Guidelines § 1B1.3 cmt. n. 2.

32. *See United States v. Studley,* 47 F.3d 569, 574 (2d Cir.1995).

33. *Id.* at 575.

34. *United States v. Mulder,* 273 F.3d 91, 118 (2d Cir.2001) (quoting *Studley,* 47 F.3d at 575).

35. *United States v. Savarese,* 404 F.3d 651, 655 (2d Cir.2005) (quoting *United States v. Medina,* 74 F.3d 413, 417 (2d Cir.1996)).

36. *See* 932 F.2d 1029, 1031 (2d Cir.1991).

37. *See id.* at 1032.

quences of their pleas.[38]

The Circuit concluded that

appeals involving claims of unfair surprise would be significantly reduced if the Government would at least inform defendants, prior to accepting plea agreements, as to the likely range of sentences that their pleas will authorize under the Guidelines. To be sure, the Government is under no legal obligation to provide this information. However, given the Government's unique expertise in muddling through the complexities of the Guidelines, providing defendants with this information would hardly be a great burden. Certainly, it would take less time than having to brief and argue an entire appeal. In *Fernandez,* we recognized the desirability of having "each defendant, at the time of tendering a guilty plea, . . . fully cognizant of his likely sentence under the Sentencing Guidelines." Consequently, we suggested that district courts should, where feasible, explain to defendants before accepting their pleas what sentence is likely to be imposed. Here, we invite Government attorneys to play a similar role in helping to ensure that guilty pleas indeed represent intelligent choices by defendants.[39]

▇ In response to *Pimentel,* the United States Attorney's Offices within the Second Circuit began routinely informing defendants of the likely range of sentences that their pleas would authorize under the Guidelines.[40] This generally takes the form of a letter sent to defendants. The Government is under no obligation to issue such a letter, however, and "the Government's estimate is not ordinarily binding on the District Court."[41]

▇ "A sentence imposed pursuant to a plea agreement 'must follow the reasonable understandings and expectations of the defendant with respect to the bargained-for sentence.'"[42] However, a *Pimentel* letter is not a binding contract between the defendant and the Government and the estimated sentencing range discussed in the letter does not represent a bargained-for sentence.

## C. The Right to a Trial by Jury

▇ "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[43] "[T]he 'statutory maximum' . . . is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."[44] Thus, the "Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged."[45] Notwithstanding recent changes in the law relating to sentencing, courts retain the "'authority to find facts

**38.** *Id.* (citations omitted).

**39.** *Id.* at 1034 (quoting *United States v. Fernandez,* 877 F.2d 1138 (2d Cir.1989)) (other citations omitted).

**40.** *See generally United States v. Cuero–Flores,* 276 F.3d 113, 115 n. 1 (2d Cir.2002).

**41.** *Id.* (citing *United States v. Rosa,* 123 F.3d 94, 98–99 & n. 3 (2d Cir.1997)).

**42.** *United States v. Palladino,* 347 F.3d 29, 33 (2d Cir.2003) (quoting *United States v. Ferrara,* 954 F.2d 103, 105 (2d Cir.1992)).

**43.** *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**44.** *Blakely v. Washington,* 542 U.S. 296, 303, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (citation omitted).

**45.** *United States v. Gaudin,* 515 U.S. 506, 511, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

relevant to sentencing by a preponderance of the evidence....' "[46] Such findings do not violate the defendant's right to a trial by jury.

### D. Due Process

 "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."[47] Indeed, "our system of the administration of justice suffers when any accused is treated unfairly."[48] "Defendants are entitled to due process up to and through the imposition of sentence."[49] "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice."[50]

 Prosecutors have a special role in our system of justice. Their function is not solely to advocate for the guilt of the defendant—rather, their goal must be truth and fairness. "For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that 'justice shall be done.' "[51]

### IV. DISCUSSION

#### A. Findings of Fact

I find that the Government has proven by a preponderance of the evidence the following facts: Angel Martinez, also known as "Druggie Lou," operated a crack cocaine distribution organization in the vicinity of 1170 Gerard Avenue ("1170").[52] The Organization, owned by Martinez, consisted of an individual, "Louie Lou," who created bundles of crack cocaine and transferred them to a manager, Terrence Davis.[53] Davis orchestrated the work of retail distributors ("pitchers") who sold crack cocaine to customers.[54] Members of the Organization often spent time in an apartment on the fifth floor of 1170, where the Organization kept several firearms.[55]

One way that customers could purchase crack cocaine was by walking outside of 1170 and signaling the pitchers, often by whistling. When they did so, the pitchers would stick their heads out of a third-floor window and observe the potential buyers.[56] If the buyers were known customers or otherwise acceptable, the pitchers would either emerge to sell them crack cocaine, or the buyers would enter the building and purchase crack cocaine from the pitchers.[57]

---

**46.** *United States v. Brown,* 514 F.3d 256, 269 (2d Cir.2008) (quoting *United States v. Garcia,* 413 F.3d 201, 220 n. 15 (2d Cir.2005)).

**47.** *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

**48.** *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**49.** *United States v. Madkour,* 930 F.2d 234, 238 (2d Cir.1991) (citing *United States v. Pugliese,* 805 F.2d 1117, 1122 (2d Cir.1986)).

**50.** *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941).

**51.** *United States v. Agurs,* 427 U.S. 97, 110–11, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**52.** *See* 3/17/08 Transcript ("Tr.") at 203:24–204:3 (testimony of Special Agent Joseph Kaleta of the Drug Enforcement Agency).

**53.** *See id.* at 28:25–29:2 (testimony of Cooperating Witness One ("CW1")).

**54.** *See id.* at 204:1–3 (testimony of Kaleta).

**55.** *See id.* at 40:17–42:1 (testimony of CW1).

**56.** *See id.* at 210:17–24 (testimony of Kaleta).

**57.** *See id.; id.* at 30:14–31:23 (testimony of CW1); *id.* at 140:10–23 (testimony of Cooperating Witness Two ("CW2")).

The Organization sold crack twenty-four hours per day, seven days per week. Pitchers for the Organization would work one of two twelve-hour shifts—the day shift (8:00 a.m. to 8:00 p.m.) or the night shift (8:00 p.m. to 8:00 a.m.).[58]

The Organization sold crack cocaine in bundles.[59] Each bundle was a large plastic bag that contained fifteen smaller plastic bags.[60] The retail price of a bundle was $150, of which the pitcher would keep $30 to $40.[61] The Government has demonstrated that each smaller bag contained on average about one hundred and seventy milligrams of crack cocaine, with minimal variance.[62] Each bundle therefore contained, on average, about two and one half grams of crack cocaine.

There is significant variance in the number of bundles a pitcher might sell. One former pitcher testified that he sold on average four to five bundles per shift.[63] Another testified that he sold on average six to ten bundles.[64] Sales were better on the night shift.[65] It may safely be assumed that a pitcher could sell on average at least four bundles (ten grams of crack cocaine) per shift. The Organization thus sold about twenty grams of crack per day, six hundred grams per month, in excess of seven kilograms per year.

Valerio was a pitcher for the Organization from at least early 2005 to November of 2006 (approximately one and one-half years).[66] Valerio frequently worked for the Organization, averaging five shifts per week.[67] On average, Valerio likely sold about ten grams per shift, or fifty grams per week, two and one half kilograms per year, or, in total, almost four kilograms of crack cocaine. The evidence also shows

---

**58.** *See id.* at 29:11–18 (testimony of CW1). *Accord id.* at 141:1–11 (testimony of CW2).

**59.** Because exact measurements of the quantity of narcotics sold by the Organization and by defendants are not available, the Court will determine a reasonable range of the quantities involved and will base its estimates on the low end of range. *See United States v. Prince*, 110 F.3d 921, 925 (2d Cir.1997) ("In the absence of a drug seizure, the district court must 'approximate the quantity of the controlled substance.' The district court's estimation need be established only by a preponderance of the evidence.") (quoting Guidelines § 2D1.1 cmt. n. 12) (citing *United States v. Moore*, 54 F.3d 92, 102 (2d Cir. 1995)).

**60.** *See* Tr. at 32:23–24 (testimony of CW1). *Accord id.* at 142:8–22 (testimony of CW2). Some bundles would contain fewer bags, but some of these bags would be "doubles," so the net weight of the crack cocaine would be the same. *See id.* at 289:22–290:2 (testimony of Kaleta).

**61.** *See id.* at 33:18–21 (testimony of CW1, claiming $30 profit); *id.* at 142:20–22 (testimony of CW2, claiming $40 profit). *But see id.* at 233:15–23 (observing that one of the controlled purchases was of five bundles for $500).

**62.** *See* Tr. at 215:17–24; 218:15–17; 220:15–23 (Kaleta reporting that three controlled purchases of crack cocaine recovered bags that weighed on average .17 grams); *id.* at 290:9–19 (reporting that a third controlled purchase recovered thirty-one bags that contained 5.4 grams of crack cocaine, on average. 17 grams per bag). *Cf. United States v. Pirre*, 927 F.2d 694, 696–97 (2d Cir.1991) (approving of the calculation of the weight of fifteen bricks of cocaine where the bricks were identical by averaging the weight of two bricks and multiplying by fifteen).

**63.** *See* Tr. at 34:15–22 (testimony of CW1).

**64.** *See id.* at 147:8–14 (testimony of CW2).

**65.** *See id.* at 34:15–22 (testimony of CW1).

**66.** *See id.* at 34:25–36:12 (testimony of CW1); *id.* at 126:13–17; 144:25–145:9 (CW1 states that Valerio frequently worked the shift that followed CW1's shift); *id.* at 147:15–24 (CW2 testified that Valerio frequently worked the day shift).

**67.** *See id.* at 205:4–11 (testimony of Kaleta).

that Valerio (among other members of the conspiracy) possessed a firearm at the apartment on the fifth floor of 1170.[68] The firearm was clearly connected to the narcotics business of the Martinez Organization.

The evidence, although weaker, also demonstrates that Allen was a pitcher for the Organization.[69] Allen began working for the Organization no later than early 2005 and continued until the Organization was disrupted by law enforcement in November of 2006.[70] Based on the witnesses' testimony, I estimate that Allen most likely worked at least one shift per week, at times in cooperation with Valerio.[71] Allen thus sold at least ten grams per week, five hundred and twenty grams per year, for a total of seven hundred and eighty grams of crack cocaine.

## B. Relevant Conduct

The Government has proven by a preponderance of the evidence that Valerio and Allen distributed crack cocaine on behalf of the Organization. The conduct to which defendants pled guilty is clearly part of the same course of conduct as their other sales on behalf of the Organization.[72] The parties dispute whether the Organization's distribution of crack cocaine should be included as relevant conduct for purposes of calculating defendants' sentences.

■ Based on the evidence presented, I find that the Government has proven by a preponderance of the evidence that the narcotics distribution activity of the Organization was within the scope of the criminal activity the defendants agreed to jointly undertake. Defendants joined the Organization knowing its purpose and illegal scheme and consciously decided to further that purpose. Defendants shared information with other pitchers to assist them in selling narcotics, swapped shifts with other pitchers to ensure that the Organization was distributing narcotics at all times, and worked in concert with other pitchers to sell crack cocaine.[73] Defendants effectively functioned as employees of the Organization.

Nonetheless, there is substantial evidence to the contrary. For example, defendants were paid only for the crack cocaine that they personally sold, suggesting an independent contractor relationship.

---

**68.** *See id.* at 102:3–18 (testimony of CW1). *See also id.* at 153:1–9 (testimony of CW2).

**69.** *See id.* at 34:25–35:21, 42:14–21, 43:13–18, 126:20–21 (testimony of CW1). *Accord id.* at 144:25–145:9; 189:16–20 (testimony of CW2).

**70.** *See id.* at 36:4, 36:25 (testimony of CW1).

**71.** *See id.* at 194:21–195:2 (testimony of CW2 that Allen worked two shifts per week); *id.* at 233:15–240:24 (testimony of Kaleta that Allen was never observed selling crack cocaine and was only identified in surveillance reports once). CW1 states that he saw Allen sell crack cocaine fewer than ten times, *see id.* at 43:7–18, though he heard from another pitcher that Allen and Valerio had sold crack cocaine together several times, *see id.* at 44:18–21.

**72.** The crack cocaine purchased from defendants by the cooperating witness was priced differently from that of the Martinez Organization's crack cocaine bundles. *See id.* at 233:15–23. However, the common facts between the controlled purchase and defendants' prior actions—the same customers, location, and narcotic substance—are sufficiently substantial to leave no significant question as to whether these sales represent the same course of conduct.

**73.** For example, video surveillance introduced at the *Fatico* Hearing demonstrates that Valerio and another member of the Organization both responded when a potential customer appeared outside 1170. *See id.* at 270:4–9. There is also evidence that Allen and Valerio worked together at times to sell crack cocaine. *See, e.g., id.* at 45:3–12 (testimony of CW1).

However, this evidence is outweighed by the factors previously discussed. When viewed as a whole, the Government has shown by a preponderance of the evidence that defendants agreed to jointly undertake in criminal activity that encompassed all of the Organization's distribution.

I further find that the full scope of the Organization's distribution was reasonably foreseeable to defendants. Both defendants spent substantial time in 1170 and clearly knew the details of how the Organization distributed narcotics. The total amounts of crack cocaine distributed by the Organization were reasonably foreseeable to them.

## C. Failure to Prove Certain Facts Beyond a Reasonable Doubt

 Defendants' contention that a sentence imposed based on a quantity of crack cocaine significantly larger than that stated in the *Pimentel* Letters would deny them their right to a trial by jury is foreclosed by Second Circuit precedent. As long as the sentence does not exceed the statutory maximum, in this case forty years' imprisonment, there is no violation of the right to a trial by jury where a court " 'find[s] facts relevant to sentencing by a preponderance of the evidence....' " [74] "[W]hen a trial judge exercises ... discretion to select a specific sentence within a defined range, the defendant has no right

to a jury determination of the facts that the judge deems relevant." [75]

It may violate due process for a defendant to be charged with one crime and then sentenced based on other crimes carrying a higher Guidelines range. [76] In this case, defendants admitted to distributing 5.4 grams of crack cocaine. [77] Neither defendant admitted possessing a firearm. Defendants' base offense level for this conduct would be 24. With the three-level adjustment for timely acceptance of responsibility, Allen could expect a sentence of 37 to 46 months, while Valerio could expect a sentence of 46 to 57 months. Instead, based on conduct not proven beyond a reasonable doubt to a jury, the Guidelines prescribe a sentence for Allen of 210 to 262 months, while Valerio faces 262 to 327 months. The vastness of this disparity gives me pause. A defendant who admitted to conduct that would send him to jail for less than four years now faces imprisonment for nearly two decades.

Were the Guidelines mandatory, and no downward departure available, this situation would present serious constitutional problems. Due process of law has little meaning if it does not protect citizens from such arbitrary exercises of power.

 But the Guidelines are not man-

---

**74.** *Brown,* 514 F.3d at 269 (quoting *Garcia,* 413 F.3d at 220 n. 15).

**75.** *United States v. Booker,* 543 U.S. 220, 233, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**76.** *See generally Blakely v. Washington,* 542 U.S. 296, 306–07, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) ("The jury could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State actually seeks to pun-

ish."); *id.* at 344, 124 S.Ct. 2531 (Breyer, J., dissenting) ("As we have recognized, the 'tail' of the sentencing fact might 'wa[g] the dog of the substantive offense.' Congress might permit a judge to sentence an individual for murder though convicted only of making an illegal lane change. But that *is* the kind of problem that the Due Process Clause is well suited to cure.") (quoting *McMillan v. Pennsylvania,* 477 U.S. 79, 88, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (alteration in *Blakely* )).

**77.** *See* Valerio Plea Tr. at 15–16; Allen Plea Tr. at 16–17.

datory.[78] Further, were defendants to be sentenced in accordance with the Guidelines, a downward departure might be appropriate. In *United States v. Cordoba–Murgas,* a defendant was convicted by a jury of participating in a drug conspiracy, an offense for which the Guidelines prescribed a term of imprisonment of 151 to 188 months.[79] Prior to sentencing, the government alleged that the defendant committed two murders in the course of the conspiracy and urged the sentencing court to apply sections 2D1.1(d)(1) and 2A1.1 of the Guidelines, which would have raised the defendant's sentence to life in prison.[80] Troubled by the significant impact of the murders on the defendant's sentence, the trial court required the government to prove the murders by clear and convincing evidence.[81] On appeal, the Second Circuit first determined that the lower court should have applied a preponderance of the evidence standard notwithstanding the extreme impact of the uncharged conduct on the defendant's sentence.[82] But the Circuit then determined that

> under the combination of circumstances that may be present here, including (i) an enormous upward adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found by only a preponderance of the evidence, (v) where the court has substantial doubts as to the accuracy of the finding, the Court would be authorized to depart downward from the scheduled adjustment by reason of the extraordinary combination of circumstances.[83]

The situation in *Cordoba–Murgas* exactly parallels that of these defendants.[84] The related conduct increases their sentencing exposure *at least five-fold* for conduct proven only by a preponderance of the evidence. While I have no doubt that the conduct in fact occurred, reasonable people could differ as to whether that conduct is within the scope of the criminal activity in which defendants agreed to engage. Although as discussed above the Government has shown by a preponderance of the evidence that the Organization's distribution was within the scope of these defendants' agreement, I am skeptical that any rational jury could make this finding beyond a reasonable doubt.[85]

**78.** They are, of course, still highly relevant to sentencing. *See Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 596 n. 6, 169 L.Ed.2d 445 (2007) ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."); *United States v. Williams,* 524 F.3d 209, 214–15 (2d Cir.2008) (determining that merely calculating a Guidelines sentence is insufficient—sentencing courts must use the Guidelines as the "initial benchmark"); *United States v. Cutler,* 520 F.3d 136, 163 (2d Cir.2008) (criticizing a sentencing court for taking a position "contrary to the policy judgments articulated by the Sentencing Commission" in the Guidelines).

**79.** *See* 233 F.3d 704, 706–07 (2d Cir.2000).

**80.** *See id.* at 707.

**81.** *See id.*

**82.** *See id.* at 709.

**83.** *Id.* (citing *United States v. Concepcion,* 983 F.2d 369, 389 (2d Cir.1992)).

**84.** Here, defendants were never charged with possession of a weapon.

**85.** I am especially concerned with respect to the finding that a firearm was possessed in connection with the activity of the Martinez Organization. The Government has introduced some circumstantial evidence to show that Allen knew of the firearm. *See* Tr. at 41:12–42:13 (CW1 observing that there were firearms in the fifth-floor apartment of 1170, one of which belonged to Valerio, and that Allen, Valerio's "best friend[ ]," was in the apartment "[a] number of times"); *id.* at 101:22–107:18 (CW1 discussing Valerio's firearm); *id.* at 186:23–187:23 (CW2 discussing firearms in that apartment); *id.* at 188:8–20

## D. Youthful Offender Status

The Government indicated that it could have indicted defendants for distributing the larger quantity of crack cocaine, but was "generous" in not doing so.[86] The Second Circuit addressed a similar situation:

> the Government [asserted that Rosa received a favorable plea bargain because it had] refrained from charging Rosa on charges relating to sale of cocaine. The sentencing court could, however, have utilized the relevant conduct provision to penalize Rosa further for the cocaine-related conduct—conduct which, under the Guidelines, need only be proven by a preponderance of the evidence rather than the more stringent beyond a reasonable doubt standard which would be required had the Government been forced to prove its case at trial—and Rosa could be left with a result just as unfavorable (or even far worse) than he would have achieved had he been charged with the conduct.... The Government's so-called "sweet deal" is thus considerably soured by § 1B1.3(a)(1)(B).[87]

In this case, defendants' sentencing exposure would have been significantly less substantial had they been charged when the Government arrested the other members of the Martinez Organization. Because both defendants were under the age of eighteen at that time, they would have likely qualified for youthful offender status. The Government's decision to introduce the higher drug quantity as relevant conduct for these offenses, rather than charging it directly when both defendants were under eighteen, has resulted in the possibility of markedly longer prison terms.[88] The Guidelines should not be an end-run around the youthful offender laws.

 The Government's charging decision, while tinged with the appearance of injustice, does not implicate any of defendants' constitutional rights. Therefore, no

---

(CW2 stating that Allen was in that apartment "four or five times out of the week ... on a regular basis"). While I realize that this evidence is sufficient to support a firearms enhancement by the Court pursuant to section 2D1.1(b)(1) of the Guidelines, no reasonable jury applying the standard of proof beyond a reasonable doubt could convict Allen for a firearms-related offense.

86. *See* Tr. at 15:5–6 ("We told them we used our discretion not to charge them in that. I thought the government was being generous.").

87. *Rosa*, 123 F.3d at 100 n. 6.

88. Based on the quantities stated in the *Pimentel* Letters, the Guidelines call for sentences for Allen and Valerio of about seven to nine years and fourteen to seventeen years in jail, respectively. Given the heightened quantities, the Guidelines now specify sentences of about seventeen to twenty-two years for Allen and about twenty-two to twenty-seven years for Valerio. I am deeply troubled by the length of time these very young men will be incarcerated as punishment for these drug offenses, not only because of the impact of such sentences on their lives and on their communities, but also because of the contribution of such long sentences to the American prison population. The United States has a far higher incarceration rate than any other nation not because we incarcerate more of our citizens, but because we imprison them for longer periods than any other nation. *See generally* Adam Liptak, *Inmate Count in U.S. Dwarfs Other Nations'*, N.Y. Times, Apr. 23, 2008, at A1 ("[I]t is the length of sentences that truly distinguishes American prison policy. Indeed, the mere number of sentences imposed here would not place the United States at the top of the incarceration lists. If lists were compiled based on annual admissions to prison per capita, several European countries would outpace the United States. But American prison stays are much longer, so the total incarceration rate is higher."). An incarceration rate six times that of other industrialized nations requires courts to scrutinize carefully the length of the sentences the Government is seeking as to these defendants.

judicial remedy is available, although defendants' age at the time of the relevant conduct may be considered at sentencing.

### E. Remedy

 Defendants' request that the Government be estopped from proving that defendants were involved with the Organization must be denied. The *Pimentel* Letters did not form a contract between defendants and the Government. The letters explicitly disclaimed any promises. Defendants stated that they understood the maximum penalties for their crimes and that there were no controlling promises that bound the sentencing court.[89]

Defendants pled guilty to the distribution of more than five grams of crack cocaine, and substantial evidence demonstrates that they distributed large amounts of crack cocaine on behalf of the Martinez Organization. Indeed, at their plea allocations they were informed of the maximum forty-year penalty rather than any advisory Guidelines range. To hold that the *Pimentel* Letters were nonetheless binding on the Government would contradict the plain language of the letters and bestow an undeserved benefit upon defendants, not to mention provide the Government with a motive not to issue *Pimentel* letters in the future. Indeed, courts have uniformly rejected attacks on sentences

where the ground is that the defendant was deceived by the *Pimentel* letter.[90]

Defendants have not moved to withdraw their guilty pleas. Potential grounds for doing so are that they were obtained involuntarily and that they offend due process. Because defendants have not requested this relief, any discussion of its availability would be premature and I express no opinion as to the resolution of any such motion.

One final possibility is a downward departure or a non-Guidelines sentence. I do not believe that such relief would always be appropriate where a defendant's relevant conduct does not match that stated in a *Pimentel* letter. In light of the circumstances of this case, the youth of the defendants at the time of the relevant conduct, the disparity in sentencing caused by the inclusion of relevant (and to some extent uncharged) conduct, and the role of the defendants in the criminal activity, this relief may be appropriate.

### V. CONCLUSION

Defendants' motions to estop the Government from introducing evidence as to their activities in connection with the Martinez Organization is denied. I hereby notify the Government that I am considering both a downward departure from the Guidelines and a non-Guidelines sentence.

---

**89.** *See* Allen Plea Tr. at 13–14; Valerio Plea Tr. at 12. For the same reasons, I reject Valerio's suggestion that the Government be estopped from asserting the broader conduct on the ground that it refused to produce the audio tape.

**90.** *See, e.g., Camposano v. United States,* 431 F.Supp.2d 399 (S.D.N.Y.2006) (rejecting an attack on a sentence where the *Pimentel* letter prescribed a criminal history level of III, but the sentencing court determined that the correct level was IV); *Bretan v. United States,* No. 05 Civ. 0916, 2006 WL 238994 (S.D.N.Y. Jan. 31, 2006) (rejecting an attack on a sen-

tence of 57 months based in part on a *Pimentel* letter that prescribed a sentence of 41 to 51 months); *Montilla v. United States,* No. 06 Civ. 3893, 2006 WL 2527809, at *2 (S.D.N.Y. Sept. 1, 2006) (rejecting an attack based on a *Pimentel* letter where "the letter's calculation of punishment was based on an earlier version of the facts"). *See also United States v. Briceno,* No. 01 Cr. 943, 2003 WL 22025870, at *2 (S.D.N.Y. Aug. 29, 2003) (rejecting the defendant's argument that the Government should be held to assertions made in a *Pimentel* letter).

438

This Amended Opinion and Order shall be effective, *nunc pro tunc,* to April 28, 2008.